# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**EDWARD COTTON,**                    :
                                       :
    **Plaintiff,**                 :
                                       :    **CIVIL ACTION FILE NO.**
    **v.**                        :    **1:16-cv-00072-TWT-AJB**
                                       :
**CARL ERIC JOHNSON, INC.,**          :
                                       :
    **Defendant.**                 :

## UNITED STATES MAGISTRATE JUDGE'S
## <u>FINAL REPORT AND RECOMMENDATION</u>

The matter is presently before the Court on a motion for summary judgment filed by Defendant Carl Eric Johnson, Inc. ("CEJ"). [Doc. 47]. For the reasons set forth herein, the undersigned **RECOMMENDS** that the motion be **GRANTED IN PART and DENIED IN PART**.

## I.    *Summary Judgment Standard*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party carries the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Fort Lauderdale,*

AO 72A
(Rev.8/8
2)

232 F.3d 836, 840 (11ᵗʰ Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).   A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   The moving party may also meet its burden by pointing out that there is an absence of evidence to support an element of the case on which the nonmoving party bears the burden of proof. *Celotex*, 477 U.S. at 325.   "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11ᵗʰ Cir. 1991).

The nonmoving party is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions, and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.   The Court must view the evidence and factual inferences in the light most favorable to the nonmoving party. *See United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11ᵗʰ Cir. 1991) (en banc).   And, to the extent that material facts are genuinely in dispute, the Court must resolve the disputes in the nonmovant's favor. *See Vaughan v. Cox*, 343 F.3d 1323, 1326 n.1 (11ᵗʰ Cir. 2003).

AO 72A
(Rev.8/8
2)

However, "the mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252. Additionally, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* If the record does not blatantly contradict the nonmovant's version of events, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *See Anderson*, 477 U.S. at 252; *see also EPL Inc. v. USA Fed. Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999); *Duke v. Cleland*, 884 F. Supp. 511, 514 (N.D. Ga. 1995). "If the record presents disputed issues of material fact, the Court may not decide them; rather, it must deny the motion and proceed to trial." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (citing *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001)).

3

## II.   Background

### A.   Facts[1]

Defendant CEJ is in the business of engineering and selling fluid-handling

systems. (D ¶ 1).[2]  Plaintiff Edward Cotton began working at CEJ through a staffing

---

[1]      In general, the facts considered in this Report and Recommendation ("R&R") are limited to those deemed by the parties to be relevant to the Court's adjudication of the pending motion for summary judgment, [*see* Doc. 47-1; Doc. 47-2; Doc. 54; Doc. 56; Doc. 61; Doc. 63; Doc. 64]. *See Mendenhall v. Blackmun*, 456 Fed. Appx. 849, 852 (11th Cir. Feb. 6, 2012) (finding it within the district court's discretion to limit its review to the specific portions of the exhibits expressly cited by the parties in their pleadings). However, while the Court "need consider only the cited materials," it may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The facts recited in this section are intended to establish the context of the case. Additional facts will also be recited in the discussion section below.

[2]      Citations that reference only paragraph numbers preceded by "D" refer to Defendant's statement of material facts, or portions thereof, that are not disputed, [Doc. 47-1], and citations that reference only paragraph numbers preceded by "P" refer to Plaintiff's statement of material facts, or portions thereof, that are not disputed, [Doc. 54]. Pursuant to the Local Rules of this Court, each of the proponent's facts will be deemed admitted unless the respondent "(i) directly refutes the [proponent's] fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the [proponent's] fact; or (iii) points out that the [proponent's] citation does not support the [proponent's] fact or that the [proponent's] fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B(1)." LR 56.1B(2), (3), NDGa. Where a factual assertion or portion thereof is properly disputed, the Court will cite to the paragraph appearing in the proponent's statement of material fact; will, as stated above, view the material evidence and factual inferences in the light most favorable to Plaintiff; and, where appropriate, will also cite directly to the evidence supporting the Court's resulting factual recitation.

AO 72A
(Rev.8/8
2)

company on April 26, 2013, and was hired by CEJ as a full-time employee on August 5, 2013.  (P ¶¶ 19, 20; D ¶ 2).  Plaintiff worked as a welder/fabricator during his time at CEJ.  (P ¶ 21; D ¶ 3).

Plaintiff was one of three welder/fabricators during his time at CEJ.  (D ¶ 7). Crystal Padilla was CEJ's Vice President and Chief Financial Officer and was also the on-site manager.  (P ¶ 1; D ¶ 38).  Padilla was the only senior manager on site, and everyone who worked in the building technically reported to her.  (P ¶¶ 4, 5).  One of the other welder/fabricators, Harold Fisher, was Plaintiff's supervisor.  (D ¶ 11). Fisher was the shop manager and reported directly to Padilla.  (P ¶ 6).

Plaintiff's job responsibilities included building equipment in accordance with drawings submitted by CEJ's engineering staff.  (D ¶ 4).  Tasks incidental to his position included gathering materials from stock, verifying materials against bills of materials, cutting raw materials to size, and welding, assembling, and preparing projects for shipment.  (D ¶ 5).  Welders/fabricators were also required to assist in CEJ's pump shop at times.  (D ¶ 93).

Prior to Plaintiff's hiring, Fisher made a Styrofoam penis for the purposes of playing a joke on an old supervisor.  (P ¶ 26).  The Styrofoam penis was twelve inches

long.  (P ¶ 29).  Following the joke, Fisher placed it in a box on a shelf in the shop.

(P ¶ 27).

Shortly after Plaintiff became a full-time employee, there was an incident where

Fisher danced suggestively and made humping motions at the table where Plaintiff was

working.   (P ¶ 24; Deposition of Edward Cotton ("Pl. Dep.") [Doc. 49] at 44-46).[3]

Plaintiff "didn't think anything of it" and, along with his co-workers, "laughed it off."

(P ¶ 25; Pl. Dep. at 44).

---

[3]     The Court recognizes that Defendant objects to many of Plaintiff's
statements of material fact on grounds that "there is no evidence supporting this alleged
material fact other than Plaintiff's self-serving testimony."  (*See, e.g.*, Def. Resp. Pl.
Statement of Mat. Fact. ¶¶ 24, 31-33, 37, 38, 52-58, 60-66, 68, 69, 74-87, 93, 95, 97-
101, 108, 111, 115, 124, 127-29).  Such objection alone does not provide a basis for
excluding evidence.  As the Eleventh Circuit has stated, "[w]hile . . . statements may
be 'self-serving' and may not be 'objective evidence,' they are evidence nonetheless."
*Equity Inv. Partners, LP v. Lenz*,  594 F.3d 1338, 1345 (11th Cir. 2010).

> [F]or purposes of summary judgment, there is nothing inherently wrong
> with "self-serving testimony," and it may not be disregarded by the
> district court in determining whether there is a genuine dispute of fact on
> a material issue in the case.  "Courts routinely and properly deny summary
> judgment on the basis of a party's sworn testimony even though it is
> self-serving."  *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005).

*Newsome v. Chatham Cnty. Det. Ctr.*, 256 Fed. Appx. 342, 346
(11th Cir. Nov. 29, 2007).  Accordingly, the objections asserted on that basis are
**OVERRULED**.

6

In mid-September 2013, Fisher found the Styrofoam penis while he was going through boxes.  (P ¶ 28).  Fisher thought it would be funny if he placed it in Plaintiff's welding helmet, and he did so.  (P ¶ 30; D ¶ 45).  When Plaintiff found the Styrofoam penis in his welding hood, he did not think it was funny and was upset.  (P ¶ 31; D ¶¶ 45, 46; Pl. Dep. at 47-49).  Seeing that Plaintiff was upset, Fisher told him that there was nothing wrong with having gay friends and that "This is how we play. . . . This is how we joke in the shop."  (P ¶ 32;  Pl. Dep. at 48).  Plaintiff responded that he "did not joke like that" and did not care what Fisher did or who Fisher's friends were but that Plaintiff did not want their sexual lifestyle imposed on him.  (P ¶ 33).

A couple of days later, the Styrofoam penis reappeared, taped to the motorcycle of James Hestir, another CEJ employee.  (P ¶¶ 34, 35; D ¶ 48; Pl. Dep. at 50-54).  When Hestir asked who had placed it on his motorcycle, Fisher pointed at Plaintiff.  (P ¶ 37).  Plaintiff's co-workers almost goaded Plaintiff into taping the Styrofoam penis to the back of another co-worker's truck, but the co-worker saw him, and Plaintiff did not follow through.  (D ¶ 47); [Doc. 3 (Compl.) at 12].  At that point, the Styrofoam penis was sitting on Fisher's work desk.  (P ¶ 38).  Plaintiff took it to Fisher's office and put it in a backpack he found hanging there.  (P ¶ 38).

AO 72A
(Rev.8/8
2)

Fisher eventually "felt things had gotten out of hand" and "cut [the penis] up, destroyed it and threw it away."  (P ¶ 42).  No one reported the pranks involving the Styrofoam penis.  (P ¶ 43).

Each welder/fabricator worked at his own individual work station.  (D ¶ 8). Plaintiff had initially worked at a station located approximately six to ten feet from the other welder/fabricators.  (D ¶¶ 9, 63).  In or around November 2013, Fisher moved Plaintiff to a different work station approximately fifteen to twenty feet from the other two welder/fabricators.  (P ¶ 49; D ¶¶ 10, 63).

Around that time, Fisher began to tell Plaintiff stories about his gay friends and how they would ask Fisher to join in threesomes with them.  (P ¶¶ 52, 68).  Plaintiff would object to the conversation and would tell Fisher that he was not gay or bisexual and was not interested in that kind of talk.  (P ¶ 53).  Fisher would respond to Plaintiff's protest by stating, "Well, don't knock it until you try it."  (P ¶ 54).  Fisher would also regularly suggest that Plaintiff would like gay oral or anal sex.  (P ¶ 55).  He would go over to Plaintiff's table; say, "Be careful what you ask for"; and move his body in a sexually suggestive manner.  (P ¶ 56).  A couple of times per week, Fisher would come up from behind Plaintiff, perform a humping motion, and make comments such as, "I

8

bet you would like it like that."  (P ¶ 57).  Fisher would call Plaintiff "baby"; say, "oh, baby"; and wolf whistle at him on a daily basis.  (P ¶ 69).

In December 2013, Fisher commented to Plaintiff that Plaintiff would not know the difference between a man sucking his penis versus a woman sucking his penis. (P ¶ 61).  In response to this, and on numerous other occasions, Plaintiff responded by telling Fisher not to "come at me like that" because Plaintiff was not gay or bisexual. (P ¶ 62).  He would repeatedly tell Fisher that Fisher's having gay or bisexual friends did not bother him but that "what does offend me is when you try to push it off on me." (P ¶ 62).

In January 2014, upon seeing Plaintiff welding with his tongue out, Fisher said, "I bet you would like it in your mouth."  (P ¶ 58).  In response, Plaintiff said, "Man, we don't play like that," and reiterated that he was not gay or bisexual and that Fisher's comments were inappropriate.  (P ¶¶ 59, 60; Pl. Dep. at 71).  On another occasion, Fisher told Plaintiff that his gay friends were going out of town and asked Plaintiff to come over to his friends' house, where he said they could be alone.  (P ¶ 66).

At another time in January 2014, Fisher came up behind Plaintiff while he was welding and grabbed him in approximately the hip area in a sexually suggestive manner, touching very close to Plaintiff's genitals.  (P ¶ 63; D ¶¶ 61, 62;

AO 72A
(Rev.8/8
2)

Pl. Dep. at 74-75, 87).[4]  Plaintiff turned around and said, "I do not play like that.  Don't touch me."  (P ¶ 64).  Fisher walked away, but later, he taunted Plaintiff by stating in front of others that Plaintiff "likes to be touched."  (P ¶ 65).

In February 2014, Plaintiff perceived that Fisher had dramatically increased his workload.  (P ¶¶ 73-75; Pl. Dep. at 84).  Fisher also denied Plaintiff's repeated requests for assistance on the grounds that Plaintiff "liked to work alone" and was told by other workers that Fisher had told them not to help Plaintiff.[5]  (P ¶¶ 76, 77).

Plaintiff was also asked to perform menial and more difficult tasks, some of which put his safety at risk.  (P ¶¶ 78-79).  Once, Plaintiff was told to take apart stickers, clean them, and put them back on.  (P ¶ 83).  Fisher told him, "If they're not on, perfectly spaced apart, then we're going to have a problem."  (P ¶ 83).  In another

-----

[4]      Defendant suggests that Plaintiff lacks credibility on this allegation because he could not recall during his deposition where, exactly, Fisher touched him.  (D ¶ 62).  The Court has reviewed the transcript and does not find the questioning clear enough to determine that Plaintiff had difficulty remembering where he was touched or made inconsistent statements on that topic.  (See Pl. Dep. at 72-74, 87).

[5]      Defendant objects on hearsay grounds to Plaintiff's reliance on his co-workers' statements regarding Fisher's instructions not to help Plaintiff.  (Def. Resp. Pl. Statement of Mat. Fact. ¶ 77).  Because the statements are offered against Defendant and are alleged to have been made by Defendant's employees within the scope of the employment relationship while it existed, the statements appear to be excluded from the rule against hearsay.  See Fed. R. Evid. 801(d)(2)(D).  The objection is therefore **OVERRULED**.

10

instance, he was directed to clean pumps without being given access to industrial gloves workers usually wear to perform the task; instead, he was given hospital gloves and wore four or five pair at a time, since the solution used to complete the task dissolves hospital gloves.  (P ¶¶ 79-81).  When Plaintiff asked Fisher for the proper gloves, he responded by saying, "We don't have no more of them.  Just get over there and do the damn job—do the job."  (P ¶ 82).

On May 19, 2014, Plaintiff requested a meeting with Padilla because he was being given so many projects without adequate help.  (P ¶¶ 87, 90; D ¶ 38).  At that point, Fisher stopped his comments and began avoiding Plaintiff.  (P ¶ 84).

Plaintiff met with Padilla on May 20, 2014.  (D ¶ 39).  Fisher also attended the meeting but only observed and did not say a word.  (P ¶¶ 91, 92).  Padilla often told Plaintiff what a good job he was doing, and during this meeting, although she mentioned a mistake Plaintiff had made on a project completed almost a year earlier, she also told him that his performance was fantastic and that he could have a job with Defendant for as long as he liked.  (P ¶¶ 94, 95).  Plaintiff requested a raise, explaining that he was being assigned extra work to complete by himself, and Padilla said she would look into it.  (P ¶¶ 93, 97; D ¶¶ 39, 69; Pl. Dep. at 98).  Padilla also asked Plaintiff why he thought his workload had increased, to which Plaintiff responded that

11

he thought that Fisher was assigning him extra work because he had complained to Fisher about Fisher's sexual comments and conduct.  (P ¶¶ 97, 98; Pl. Dep. at 98-100).  Plaintiff strongly expressed his concerns; provided some details, including describing the remarks Fisher made about oral and anal sex; and told Padilla that he considered the conduct to be harassment.  (P ¶¶ 99-100).  Padilla told Plaintiff that she would conduct an investigation and get back to him.  (P ¶ 101).

Shortly after the meeting, Padilla denied Plaintiff's request for a raise.  (D ¶ 40; Pl. Dep. at 201); [Doc. 3 (Compl.) at 13].  The only thing Plaintiff saw in response to his complaints about Fisher's conduct was that Padilla ordered all of the photographs of women in bikinis that were posted throughout the shop floor to be taken down.  (P ¶ 102; Affidavit of Edward Cotton [Doc. 60-1] ¶ 2).

On or about June 3, 2014, Plaintiff's employment was terminated, ostensibly because of mistakes on several projects on which he had worked.  (P ¶ 109; D ¶ 41).

### B.    *Procedural History*

Plaintiff initiated this case by filing a *pro se* application to proceed *in forma pauperis*, which the Court granted on April 14, 2016.  [Docs. 1-3].  Thereafter, Plaintiff obtained counsel and filed an amended complaint on October 6, 2016, with leave of Court and opposing counsel.  [Docs. 23-25].  In the amended complaint, he asserts

AO 72A
(Rev.8/8
2)

claims for sex discrimination (Count One), sexual harassment (Count Two), and retaliation (Count Three) under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* [Doc. 25].

Following the close of extended discovery, Defendant filed the pending motion for summary judgment. [Doc. 47]. Plaintiff filed a response in opposition to the motion, [Docs. 56, 61],[6] and Defendant filed a reply in support of the motion, [Docs. 63, 64]. With briefing complete, the Court now enters this R&R for the District Judge's consideration.

## III.   *Discussion*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Although Title VII does not mention "harassment," the phrase "terms, conditions, or privileges of employment" is interpreted to encompass

---

[6]      Because Plaintiff's initial response brief, [Doc. 55], did not comply with the instructions set forth in the Court's scheduling order, the Court directed Plaintiff to file an amended brief. [*See* Doc. 57]. The Court considers the amended response brief, [Doc. 61], to completely supersede the original response brief.

13

"the entire spectrum of disparate treatment" of protected classes in employment, "which includes requiring people to work in a discriminatorily hostile or abusive environment." *Mendoza v. Borden, Inc*., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc). Title VII also makes it unlawful for an employer to retaliate against an employee for his participation in certain statutorily protected activities:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a); *see also Biniashvili v. Bohne*, 397 Fed. Appx. 597, 598-99 (11th Cir. Sept. 28, 2010).

### A. *Harassment*

### 1. *Severe or Pervasive Conduct*

To state a plausible claim for hostile work environment or harassment under Title VII, a plaintiff must, among other things, plead facts showing that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. *Miller v. Kenworth of Dothan Inc*., 277 F.3d 1269, 1275 (11th Cir. 2002). To establish that conduct is sufficiently severe or pervasive to alter the terms and conditions of employment, the

14

plaintiff must establish both subjective and objective components. *Id.* at 1276. The subjective component is met when "the complaining employee perceived [the conduct] to be [severe or pervasive] at the time" of the harassment. *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004). In evaluating the objective component, a court examines whether the actions of the employer altered the employee's working conditions to such an extent that a reasonable person would find the atmosphere hostile and abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22-23 (1993). The objective component of this prong "is somewhat fact intensive." *Mendoza*, 195 F.3d at 1246. In that regard, adjudicating fact-specific sexual harassment cases often leaves federal courts in the unfortunate position of "decid[ing] what is 'sufficiently severe' by resorting to 'crudity comparables.' " *Breda v. Wolf Camera, Inc.*, 148 F. Supp. 2d 1371, 1376 (S.D. Ga. 2001). That is, judges must compare the crudity and 'lewdity' found in one case with that deemed sufficient to survive a Rule 50 or 56 motion in another." *Id*.

To determine whether conduct is objectively severe or pervasive, courts typically consider factors including: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the

15

employee's job performance. *Miller*, 277 F.3d at 1276. These four factors are used to "delineate a minimum level of severity or pervasiveness necessary for harassing conduct to constitute discrimination in violation of Title VII." *Mendoza*, 195 F.3d at 1246. The inquiries serve to ensure that Title VII does not become "a general civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998).

Defendant argues that the undisputed evidence shows that, "at the time he was employed by CEJ, [Plaintiff] did not subjectively perceive any of Mr. Fisher's alleged conduct to be sexual harassment." [Doc. 47-2 at 14]. Specifically, Defendant points to Plaintiff's testimony that it was only after his termination that, upon reflection, he determined that he had been sexually harassed, (D ¶ 43), and it contends that Plaintiff's "admission" that he did not subjectively perceive Fisher's conduct as sexual harassment is corroborated by evidence that Plaintiff participated in the practical jokes involving the Styrofoam penis, (D ¶¶ 44, 47), Plaintiff's testimony that Fisher's dancing and humping did not hurt Plaintiff's feelings, offend him, or otherwise harm him in any way, (D ¶ 53), Plaintiff's inability to recall at deposition any of the lewd jokes he alleged Fisher had told, (D ¶ 56), and Plaintiff's testimony that he did not report Fisher's humping and comments regarding his "gay friends" on at least one occasion

16

because he "didn't find it to be a big deal," (D ¶ 58).  [Doc. 47-2 at 14-15].  Defendant

further contends that "[e]ven if Plaintiff's allegations concerning Mr. Fisher's conduct

are taken as true," no reasonable person would find the conduct to be sufficiently severe

to create a hostile work environment.  [*Id.* at 15 (citing *Gupta v. Fla. Bd. of Regents*,

212 F.3d 571, 584-86 (11th Cir. 2000); *Mendoza*, 195 F.3d at 1247-48)].

The Court is not persuaded that a reasonable jury could not find that Fisher's

conduct met the "severe or pervasive" standard.  Defendant is correct that *Gupta* and

*Mendoza* set a high bar for conduct to be objectively considered "severe or pervasive":

in *Gupta*, a panel of the Eleventh Circuit held that the employer's conduct was not

sufficiently "severe or pervasive" where the conduct included telling the plaintiff one

time that she was beautiful, frequently calling her at home over weekends and at 9:30

or 10:00 at night, staring at her twice, repeatedly asking her to lunch, touching her

jewelry once, touching her knee once, unbuttoning his pants and tucking in his shirt in

her presence once, and touching the hem of her dress once, *Gupta*, 212 F.3d at 584-86,

and in *Mendoza*, a panel reached the same conclusion when presented with evidence

that the employer told the plaintiff once, "I'm getting fired up," on one occasion rubbed

his hip against hers while touching her shoulder and smiling at her, once made sniffing

noises while staring at her groin, once made sniffing noises without looking at her

17

groin, and followed and stared at her "constantly," *Mendoza*, 195 F.3d at 1247-48. Notably, however, the court explained in *Gupta* that the employer's conduct, while sometimes overly personal, was not sexually explicit or threatening, *Gupta*, 212 F.3d at 584-86, and explained in *Mendoza* that the alleged conduct was not physically threatening or humiliating and that there was no evidence the cumulative effect of the conduct "unreasonably interfered" with the plaintiff's job performance, *Mendoza*, 195 F.3d at 1247-48. In contrast, the accused conduct in the present case was both frequent and overtly sexualized: the suggestive dancing, the "humping motions" that Fisher would frequently make, the "joke" involving the placement of a Styrofoam penis in Plaintiff's welding helmet, Fisher's stories about threesomes, Fisher's "regular" suggestions that Plaintiff would like gay oral or anal sex, the daily wolf whistles, the one instance where Fisher came up behind Plaintiff and grabbed him near his genitals, and Fisher's taunts that Plaintiff "likes to be touched." (P ¶¶ 24, 30, 31, 52, 54-58, 61, 63, 65, 68; Pl. Dep. at 44-46, 74-75, 87). The record also contains evidence of conduct reasonably construed as humiliating and physically threatening: Plaintiff's testimony that Fisher caused Plaintiff's workspace to be physically further away from his co-workers so that his comments and conduct were less apparent to others; that Fisher would come up from behind Plaintiff and make his humping motions

18

and comments; that Fisher came up from behind Plaintiff while he was welding when he touched him near his groin; that Fisher told Plaintiff, "I bet you would like it in your mouth"; and that Fisher asked Plaintiff to come over to his friends' house, where he said that they could be alone.  (P ¶¶ 49, 57, 58, 66; D ¶¶ 9, 10, 63).  The record also contains evidence that the conduct interfered with Plaintiff's job performance, in that the conduct made it difficult for Plaintiff to concentrate on his work, resulted in a drop in quality in his work, caused him to become depressed by the job, and eventually caused him to seek counseling.  (P ¶¶ 124-29).  Thus, the Court concludes that neither *Gupta* nor *Mendoza* presents a bar to Plaintiff's ability to establish that Defendant's conduct was so "severe or pervasive" as to create a hostile work environment.

The undersigned also finds Defendant's argument regarding Plaintiff's alleged lack of subjective perception of harassment to be unavailing.  First, the argument requires the Court to resolve the facts regarding Plaintiff's subjective perception of Fisher's conduct in a light unfavorable to Plaintiff, which, of course, the Court cannot do upon a motion for summary judgment.  To wit, while there is evidence showing that Plaintiff had some involvement in jokes involving the Styrofoam penis, there is also evidence suggesting that his co-workers goaded him into participating, which is not inconsistent with his allegation that he was offended when Fisher placed the Styrofoam

19

penis in his welding hood, (D ¶ 47); [Doc. 3 (Compl.) at 13]; while Plaintiff did state

that Fisher's dancing and humping did not hurt Plaintiff's feelings, offend him, or

otherwise harm him in any way, review of the deposition transcript shows that the

statement was made in the context of Plaintiff's first month of employment and that

other testimony supports Plaintiff's allegation that later, after many requests for Fisher

to stop, Fisher's cumulative conduct began to hurt Plaintiff's feelings, offend him, and

harm him emotionally, (D ¶¶ 53, 58; Pl. Dep. at 86-89, 93); and while Plaintiff's

inability to repeat any of Fisher's "lewd jokes" in his deposition testimony may cut

against his credibility before a jury, his inability to do so certainly does not establish

that there is no genuine issue of material fact as to whether he subjectively found

Fisher's sexual comments and conduct to be severe or pervasive, (D ¶ 56).

Second, Defendant's argument seeks to hold Plaintiff to an improper legal

standard, as it faults Plaintiff for admitting that "while employed at CEJ, [he] did not

consider any of Mr. Fisher's alleged behavior to be sexual harassment."

[Doc. 47-2 at 14 (citing D ¶ 43)].  As stated above, the subjective element of a claim

for sexual harassment requires not that the employee have subjectively perceived that

the conduct was "sexual harassment" but rather, simply that the plaintiff subjectively

perceived the conduct to be sufficiently severe or pervasive to alter the terms and

20

conditions of his employment. *Hulsey*, 367 F.3d at 1248. In other words, Defendant's argument presumes that Plaintiff's failure during his employment to characterize Fisher's conduct as "sexual harassment" is inconsistent with him also finding the conduct so severe or pervasive as to alter the terms and conditions of his employment. [Doc. 47-2 at 14]. The Court finds that this argument presumes too much: reading the cited testimony in the light most favorable to Plaintiff, a reasonable finder of fact could certainly conclude that at least as of November 2013, Plaintiff found Fisher's conduct to be so severe and pervasive as to alter the terms and conditions of his employment, but that Plaintiff did not reach the legal conclusion that it was "sexual harassment" until he thought about it later. (Pl. Dep. at 62, 93, 149-50).

In sum, the undersigned finds that the evidence is sufficient to allow a reasonable finder of fact that Defendant's conduct was objectively severe and pervasive and that Plaintiff perceived it to be so during at least the later portion of his employment.

## 2.  *Reasonable Care to Prevent and Correct the Conduct*

In order for a defendant to be held liable on a harassment claim, the employee must also show that the employer is liable based upon respondeat superior. *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982). If the harasser is a co-worker, the plaintiff must show that the employer (1) had adequate notice of the harassment and

AO 72A
(Rev.8/8
2)

(2) failed to take adequate remedial steps to abate it.  *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999), *superseding* 160 F.3d 688 (11th Cir. 1998); *Henson*, 682 F.2d at 905.  On the other hand, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  Even where the harasser is a supervisor, however, an employer may still avoid liability for a hostile work environment where the employer can show that (1) the employer "exercised reasonable care to prevent and correct promptly any . . . harassing behavior," and (2) the plaintiff employee "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise."  *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765; *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1258 (11th Cir. 2014); *accord Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship*, 490 F.3d 1302, 1308-09 (11th Cir. 2007).[7]

---

[7]     The *Faragher/Ellerth* defense may not be raised if the supervisor takes a tangible employment action, *i.e.*, a decision involving hiring, firing, failing to promote, reassignment, or another decision involving a significant change in benefits.  *See Ellerth*, 524 U.S. at 761, 765.  Although Plaintiff was terminated in this case, he does not argue that his termination bars Defendant from relying on the *Faragher/Ellerth*

AO 72A
(Rev.8/8
2)

Defendant, presuming that Fisher was Plaintiff's "supervisor" within the context of a Title VII sexual-harassment claim, argues that regardless of whether Plaintiff is able to meet the "severe or pervasive" element of the *prima facie* case for his sexual-harassment claim, Defendant is entitled to summary judgment on the claim because it took reasonable steps to prevent any sexually harassing conduct by establishing a written sexual-harassment policy, (D ¶¶ 74-82); Plaintiff failed to take advantage of the written sexual-harassment policy for eight months, (D ¶¶ 69-72); and no harassing conduct is alleged to have taken place after Plaintiff finally made a report to Padilla, (D ¶ 68).  [Doc. 47-2 at 15-19].   In response, Plaintiff argues that he followed the policy by stating his objections to Fisher, his immediate supervisor, (P ¶¶ 48, 70-72); argues that the policy was not effective because there was no training on it, (P ¶¶ 10, 11, 16), employees were required to acknowledge receipt of the policy but not to certify that they had read it, (P ¶ 11), and Fisher had not, in fact, read it, (P ¶ 13); and he explains that he did not approach Padilla with complaints about

---

defense.  [*See* Doc. 61, *passim*]. Nor is it clear that he has alleged or can show evidence that there was "a causal link between the tangible employment action[, *i.e.*, his termination] and the [hostile work environment]," which would be necessary if he were to seek to bar Defendant from asserting the *Faragher/Ellerth* defense on that basis. *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006); *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312 (11th Cir. 2001).  Thus, the Court examines whether Defendant is otherwise entitled to assert the defense.

23

Fisher's continued conduct because he was too embarrassed to report the conduct to a woman, (P ¶¶ 85, 86). [Doc. 61 at 5-10]. Defendant, in reply, contends that Plaintiff telling Fisher, "I don't joke like that," and, "Don't do that," could not reasonably be considered to be recognizable "complaints" of sexual harassment and that it was not reasonable for Plaintiff to expect Fisher to self-report his own alleged sexual harassment, for Plaintiff to refuse to report Fisher's conduct to Padilla because Padilla is a woman, or for Plaintiff not to raise the issue with any other supervisor or member of management. [Doc. 63 at 6-8].

Because Defendant seeks to establish the *Faragher/Ellerth* defense on summary judgment, it " 'must show that, on all the essential elements of [this affirmative defense], no reasonable jury could find for the non-moving party.' " *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (en banc)); *accord Nurse "BE,"* 490 F.3d at 1309 ("As an affirmative defense, the defendant bears the burden of establishing both of these elements."). In this case, neither party has proffered legal authority beyond that establishing the basic framework of the *Faragher/Ellerth* defense. [*See* Doc. 47-2 at 15-19; Doc. 61 at 5-10; Doc. 63 at 6-8]. After conducting its own legal research, however, the Court is not persuaded that Defendant has sufficiently

24

established that it met the first element of the *Faragher/Ellerth*—specifically, that Defendant took reasonable care to prevent harassment.

An employer takes reasonable care to prevent harassment if it has a valid anti-discrimination policy that prohibits harassment, is effectively communicated to all employees, and has reasonable reporting requirements and procedures. *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1303 (11th Cir. 2007); *Frederick*, 246 F.3d at 1314 (requiring employer to show that its policy "was effectively published," "contained reasonable complaint procedures" and "contained no other fatal defect"). " 'In determining whether an anti-harassment policy is sufficiently reasonable, [courts] look to whether the employer made it well-known to employees, vigorously enforced it, and included alternate avenues of redress.' " *Fields v. Atlanta Indep. Sch. Sys.*, 916 F. Supp. 2d 1348, 1370 (N.D. Ga. 2013) (Thrash, J., *adopting* Vineyard, M.J.) (quoting *Howard v. City of Robertsdale*, 168 Fed. Appx. 883, 887 (11th Cir. Feb. 9, 2006) (alteration in *Fields*)).

Defendant's discrimination policy is lacking in several respects.  First, while the Eleventh Circuit has refused to create a uniform test for determining whether an employer has developed reasonable reporting requirements and procedures, an employer must, at a minimum, establish a procedure that encourages a victim of

25

harassment to give notice of the harassment without requiring the victim to complain to the harasser. *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298-99 (11th Cir. 2000); *Fields*, 916 F. Supp. 2d at 1370. Here, it is undisputed that Defendant, through the sexual-harassment policy set forth in its employee handbook ("the Handbook"), encourages its employees first "to let offending persons know the employee finds the conduct offensive," then, "[o]nly if the harassing conduct does not stop or it recurs is the employee encouraged to file the appropriate complaint with Management." (D ¶ 81). Thus, Defendant's policy does not meet the minimum standard for reasonableness.

Second, even if the policy did not direct the aggrieved employee to first address the offensive conduct with the perpetrator, Defendant has not established the absence of a genuine issue of material fact as to whether a sufficient number of alternative avenues of address were available to Plaintiff. The Handbook instructs that if the conduct continues or recurs after the employee addresses it with the perpetrator, the employee is to report the harassment to the employee's immediate supervisor. (D ¶ 77). If the employee believes reporting the harassment to his/her immediate supervisor "would be inappropriate or embarrassing," then the employee is instructed to report the harassment to any supervisor or member of management, including the President of

26

CEJ. (D ¶ 78). Here, the alleged perpetrator was Plaintiff's supervisor, Fisher, (D ¶ 11), and Defendant has not proffered evidence that Plaintiff had meaningful access to any additional supervisor other than Padilla, with whom Plaintiff was embarrassed to speak about the harassment, (P ¶¶ 4-5, 85-86). Accordingly, Defendant has not established that the policy allowed sufficient avenues for redress. *Cf. Mack v. ST Mobile Aerospace Eng'g, Inc.*, 195 Fed. Appx. 829, 840 (11th Cir. July 31, 2006) (finding insufficient avenues of address where only two company representatives could receive complaints, and they both displayed insensitivity to harassment).

Third, certain facts suggest that the policy may not have been effective or rigorously enforced. While Defendant shows that Plaintiff at least acknowledged receipt of the policy, there is no showing that any other employee received the policy, received training on it, or read it, and, in fact, it is undisputed that Padilla, Fisher, and Plaintiff had not received sexual-harassment training; that no sexual-harassment training was provided other than the policy appearing in the Handbook; and that Fisher had not read the policy. (P ¶¶ 10-13, 16-17). Defendant's statement that CEJ had never received a sexual-harassment complaint prior to Plaintiff's also suggests that the reporting policy may not have been well-known to employees. (Def. Resp. Pl. Statement of Mat. Fact. ¶ 16).

27

Moreover, there is evidence that the policy was not followed. The parties agree that the Handbook requires the supervisor to whom a sexual-harassment report is made to make a complete investigation and compose a written report within ten days of the complaint. (D ¶¶ 79-80). The only evidence presented to the Court of any follow-up to Plaintiff's complaint of harassment is Plaintiff's testimony that after he complained to Padilla about Fisher's conduct, the only response he saw was that Padilla ordered all photographs of women in bikinis posted on the shop floor to be taken down. (P ¶ 102). Thus, the Court finds factual issues as to whether the policy was effective. *See Mack*, 195 Fed. Appx. at 840 (finding factual issues as to a sexual-harassment policy's effectiveness where there was evidence that supervisors had failed to fulfill their obligations under the policy).

For all of these reasons, the undersigned concludes that Defendant has failed to establish the lack of a genuine issue of material fact as to all of the elements of the *Faragher/Ellerth* affirmative defense. The undersigned therefore finds no basis for granting Defendant's motion for summary judgment of Plaintiff's harassment claims on that ground.

28

**B.     Retaliation**

Plaintiff contends that Fisher retaliated against him for objecting to Fisher's comments and conduct by giving Plaintiff the more difficult assignments, preventing him from getting assistance on jobs, requiring him to perform dangerous work without proper protective gear, moving his work station, and isolating him from his fellow workers.  [Doc. 25 ¶¶ 12-13].  He also appears to allege that he was discharged in retaliation for reporting Fisher's conduct to Padilla.  [*Id*. ¶¶ 19-25].

When a party relies on circumstantial evidence to prove his or her case of discrimination, as Plaintiff does in the instant case, courts employ the familiar burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005); *see also Lawver v. Hillcrest Hospice, Inc.*, 300 Fed. Appx. 768, 772 (11th Cir. Nov. 24, 2008) (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998)).

Under the *McDonnell-Douglas* framework, a plaintiff first must establish a *prima facie* case of discrimination.  *See, e.g.*, *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*,

29

446 F.3d 1160, 1162 (11th Cir. 2006).  To establish a *prima facie* case for a retaliation claim, a plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was a causal link between the two. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

If the plaintiff establishes a *prima facie* case, he has created an inference of discrimination, and the defendant has the burden of producing a legitimate, nondiscriminatory reason for its adverse action.  *Goldsmith*, 513 F.3d at 1277.  If the defendant meets this light burden of production, then the inference of discrimination is rebutted, and the inquiry "proceeds to a new level of specificity in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 (11th Cir. 2008) (quoting *EEOC v. Joe's Stone Crab, Inc.*, 296 F.3d 1265, 1272-73 (11th Cir. 2002)).  To demonstrate pretext, the plaintiff must provide evidence that "reveal(s) 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.' "  *Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)).  Despite this

30

burden-shifting framework, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 1999) (quoting *Burdine*, 450 U.S. at 253).

Defendant's motion for summary judgment does not challenge the "statutorily protected activity" element of Plaintiff's retaliation claims. [Doc. 47-2 at 20-25]. Defendant argues, however, that the only materially adverse action Plaintiff suffered was his termination and that he was terminated not in retaliation for his complaints of discrimination but instead because of poor job performance. [*Id*. at 21-25].

With regard to Plaintiff's claim that Fisher retaliated against him by moving his workstation and isolating him from his co-workers, the Court finds that Defendant has the better end of the argument. In order to establish that he suffered a materially adverse action, an employee must show that a reasonable employee would have found the challenged action to be materially adverse, meaning that the adverse action is harmful to the point that it "could well dissuade a reasonable worker" from engaging in statutorily protected activity. *Burlington N.*, 548 U.S. at 57. It is undisputed that Plaintiff initially worked at a station located approximately six to ten feet from other welder/fabricators and that when Fisher caused him to change workstations in

31

November 2013, it was to a work station approximately fifteen to twenty feet from the other welder/fabricators, and after moving work stations, Plaintiff was still able to communicate with the other two welder/fabricators at nearby work stations without shouting.  (D ¶¶ 9-10, 13).  The undersigned finds that no reasonable finder of fact could determine that a simple move of no more than fourteen feet to another workspace still within speaking distance of his co-workers could dissuade a reasonable worker from engaging in statutorily protected activity.   Accordingly, it is hereby **RECOMMENDED** that the District Judge **GRANT** Defendant's motion for summary judgment on Plaintiff's claim for retaliation arising from his workspace move.

The undersigned is not persuaded, however, that Defendant is entitled to summary judgment on Plaintiff's claims that Fisher retaliated against him by giving him more difficult assignments, preventing him from getting assistance on jobs, and requiring him to perform dangerous work in the pump shop without proper protective gear.  Defendant does not argue that the alleged retaliatory conduct was not materially adverse, but rather that it did not happen: that Fisher, as the most experienced welder/fabricator and the shop manager, took on the more difficult projects himself, (D ¶ 86); that Plaintiff received adequate help on all projects, received help whenever he asked, and is not credible in claiming otherwise because he could not, at deposition,

32

name a specific project on which he was denied help, (D ¶¶ 83-85, 87-91); and that Plaintiff was not forced to work without proper protective gear, as boxes of latex gloves were available for anyone's use, (D ¶ 94). [Doc. 47-2 at 21-24]. However, Defendant's allegation that Fisher took on the most difficult projects relies on Fisher's self-serving testimony, (D ¶ 86), and its suggestion that Plaintiff was supplied with proper protective gear relies on Padilla's self-serving testimony, (D ¶ 94), all in contradiction to Plaintiff's testimony that Fisher assigned him difficult and dangerous work and would not allow him access to the workman's gloves he needed to safely perform the specific tasks he was assigned, (P ¶¶ 78, 80-82), and thus presents the sort of classic "he said / she said" dispute that cannot be resolved upon summary judgment. Defendant's allegation that Plaintiff received help whenever he asked similarly relies on Fisher's self-serving testimony, (D ¶ 85), and unauthenticated co-worker time sheets, (D ¶¶ 87-91), and contradicts Plaintiff's testimony that Fisher increased his workload and denied his requests for help appropriate to the task, (P ¶¶ 73-78). And while Plaintiff's inability to name a specific project at deposition would likely impact his credibility with a jury, the Court also notes that Plaintiff did, at deposition, describe a task where he was refused assistance and was injured as a result, and thus, his allegation is not entirely without testimonial support. (Pl. Dep. at 202-03). Accordingly, the

33

undersigned concludes that a genuine issue of material fact remains with regard to Plaintiff's claims that Fisher retaliated against him by giving him more difficult assignments, preventing him from receiving assistance on jobs, and requiring him to perform dangerous work in the pump shop without proper protective gear.

As to Plaintiff's claim for retaliatory termination, Defendant argues that it had a legitimate, nondiscriminatory reason for terminating Plaintiff's employment: he made significant and costly mistakes on several projects. [Doc. 47-2 at 24-25 (citing D ¶¶ 16-37, 41)].   Plaintiff does not dispute that Defendant has submitted a nonretaliatory reason for his termination.  [Doc. 61 at 16-19].  Plaintiff contends, however, that a genuine issue of material fact exists with regard to whether the stated nondiscriminatory motive is actually a pretext for illegal retaliation.  [*Id.*].

To avoid summary judgment, a plaintiff " 'must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination,' " *Brooks*, 446 F.3d at 1163 (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)), since a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).  "Provided that the proffered reason is one that

34

might motivate a reasonable employer, an employee must meet that reason head on and rebut it." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). He may do this "(1) by showing that the legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons." *Standard*, 161 F.3d at 1332.

Plaintiff largely takes the second approach, pointing out that he was terminated just fourteen days after he complained to Padilla about Fisher's conduct, [Doc. 61 at 18-19 (citing P ¶¶ 97-100, 104-06)], and arguing that any recent performance issues he did have were caused by Plaintiff's difficulties concentrating as a result of Fisher's harassment and Fisher's withholding of appropriate and necessary assistance, [Doc. 61 at 19 (citing P ¶¶ 76-77, 109-16, 124-25)].  The record also contains evidence lending credence to Plaintiff's argument that discriminatory reasons were more likely the cause of his termination: it is undisputed that prior to November 2013, there were no issues with Plaintiff's work product, (D ¶ 15); Plaintiff testifies that he was never told of performance problems significant enough to cause him to lose his job, (P ¶ 115); it is undisputed that there are no written notes, reprimands, or records of deficiencies in Plaintiff's performance, (P ¶¶ 111-14); Plaintiff testifies, uncontradicted by Fisher, who

35

was also at Plaintiff's May 20, 2014, meeting with Padilla, that Padilla reviewed some quality control issues with Plaintiff's work during the meeting but also told Plaintiff at the meeting that his performance was fantastic and that he could have a job with Defendant for as long as he liked, (P ¶¶ 91-92, 94-96); and Plaintiff shows that in an abrupt about-face, he was terminated fourteen days after the meeting, (P ¶¶ 91, 98-100, 106, 108), at least partially upon Fisher's advice, (P ¶ 107), for mistakes Fisher knew Plaintiff's co-worker had made, (P ¶¶ 109-10; Deposition of Sean Long [Doc. 66-1] at 100-01). The undersigned finds this evidence sufficient to enable a reasonable finder of fact to determine that discriminatory reasons more likely motivated Defendant's decision to terminate Plaintiff's employment than the reasons proffered. The undersigned therefore finds no basis in Defendant's arguments for granting its motion for summary judgment on Plaintiff's retaliatory termination claim.

### C.      *Gender Discrimination*

The Court notes that although Defendant's motion for summary judgment is styled as a motion for summary judgment on all of Plaintiff's claims, [Doc. 47], the brief filed in support of the motion contains no argument regarding Plaintiff's claim for gender discrimination, [Doc. 47-2]. Be that as it may, the undersigned finds nothing in Plaintiff's complaint or in the evidence reviewed upon Defendant's motion for

AO 72A
(Rev.8/8
2)

summary judgment to suggest that Plaintiff can assert a gender-discrimination claim separate from his claim for sexual harassment.

In order to prevail on a claim for gender discrimination under the *McDonnell-Douglas* framework, a plaintiff must show that he was subjected to adverse employment action, his employer treated similarly situated employees outside his gender classification more favorably, and he was qualified to do the job. *Hawkins v. Potter*, 316 Fed. Appx. 957, 960 (11th Cir. Mar. 3, 2009). He could also prevail on a gender-discrimination claim if he could present " 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker' " on the basis of gender. *Galdamez v. DHL Air Exp. USA*, 578 Fed. Appx. 887, 892 (11th Cir. Aug. 25, 2014) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Here, however, the pleadings do not contain any allegation that Plaintiff was treated differently from a similarly situated person of another gender or that there was other circumstantial evidence of gender discrimination, nor has the Court's review of the parties' proffers revealed evidence sufficient to enable a reasonable finder of fact to find that Plaintiff suffered an adverse employment action (other than harassment) due to his sex. Accordingly, the

AO 72A
(Rev.8/8
2)

undersigned **RECOMMENDS** to the District Judge that he *sua sponte* **DISMISS**

Plaintiff's sex-discrimination claim (Count One) prior to trial.[8]

## IV.    Conclusion

For the reasons set forth above, the undersigned **RECOMMENDS** to the

District Judge that Defendant's motion for summary judgment, [Doc. 47], be

**GRANTED IN PART and DENIED IN PART**.  Should the District Judge adopt this

R&R in full, Count One will be dismissed, the claim in Count Three that Defendant

retaliated against Plaintiff by moving his workstation will be dismissed, and all other

claims will remain.

---

[8]    The procedure for dismissal must be fair, and "[t]o employ fair procedure, a district court must generally 'provide the plaintiff with notice of its intent to dismiss or an opportunity to respond.'"  *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1336 (11th Cir. 2011) (quoting *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1069 (11th Cir. 2007); *accord Burgess v. United States*, 874 F.3d 1292, 1298-99 (11th Cir. 2017) (holding that court first had to give parties fair notice and chance to present positions on collateral-action-waiver defense).  An R&R provides such notice and opportunity to respond.  *Shivers v. Int'l Bhd. of Elec. Workers Local Union 349*, 262 Fed. Appx. 121, 125, 127 (11th Cir. Jan. 8, 2008) (indicating that a party has notice of a district court's intent to *sua sponte* grant summary judgment where a magistrate judge issues a report recommending the *sua sponte* granting of summary judgment); *Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d 1280, 1296 (N.D. Ga. 2009) (Martin, J., *adopting* Baverman, M.J.) (noting that R&R served as notice that claims would be *sua sponte* dismissed).  Thus, should Plaintiff believe in good faith that evidence exists that would allow a reasonable jury to find in his favor on Count One, he may raise such argument as an objection to this R&R.

AO 72A
(Rev.8/8
2)

Because this case presents no other issues referred to Magistrate Judges pursuant to Standing Order 14-01, the Clerk is hereby **DIRECTED** to **TERMINATE** reference to the undersigned.

**IT IS SO RECOMMENDED and DIRECTED**, this the 18th day of January, 2018.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

39